The Honorable, the United States Court of Appeals to the First Circuit now in session. All persons having any business before this Honorable Court may draw near, give their opinions, and they shall be heard. God save the United States of America and this Honorable Court. Good morning. Please be seated. Morning session. Today's cases will be called as previously announced and with the times as allotted to counsel, the first case today, number 24-1988, United States v. Richard Evans. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin? Good morning. I'm Martin Weinberg along with Michael Pabian, who is the appellant. Mr. Evans, I would ask to reserve two minutes for rebuttal. Yes, two minutes. The willful blindness instruction that was given at the government's request in this case superimposed on a trial record where the government exclusively and repeatedly argued that there was actual knowledge of wrongfulness on behalf of Captain Evans. Over and over again, they argued he was a thief, a fraud, that he repeatedly lied and that he repeatedly certified overtime documents where police officers were paid in four-hour blocks having worked for less than four hours either on what they called split shifts where they each worked two of the four hours or later in the 2012-2016 period where they worked for less than two hours. The test that this court has set for when a willful blindness instruction is warranted is whether the government provides sufficient evidence that a defendant was aware of, quote, a high probability of wrongdoing and thereafter made a conscious choice of deliberately closing his eyes, refusing to investigate under circumstances where the evidence showed that an investigation would lead to actual knowledge. Can I just ask you a clarifying question, and this may be my own lack of understanding, but it seemed to me in your opening brief that you don't seem to be challenging that Evans had actual knowledge, but then I interpreted you as sort of switching gears in your reply brief. Could you address that? Sure. We don't argue that under a traditional Rule 29 standard this court should reverse the honest services convictions on Rule 29 grounds, although we do on 666 grounds for separate reasons. We do argue, however, that the sufficient evidence to go to a jury on actual knowledge did not warrant and should not have resulted in a dilution of that critical essential element of mens rea, which is to prove that Captain Evans actually knew when he crossed the line, whether he crossed the line from innocence to guilt, that the jury should have alone decided this under the cornerstone mens rea standards of actual knowledge and willfulness. And the defense here was not that he actually had knowledge of wrongdoing. The defense here was that he adopted and inherited an ongoing custom and practice that wasn't in violation of any collective bargaining agreement or Boston regulation and that it had been set in place by a captain, an equally credentialed captain, which is there's 20 captains in a Boston police force of 2,000 officers. This is the highest you can go civil service. Anyone above that is appointed. And this custom and practice was set by Captain Tondav before him that sergeants and officers, the entire warehouse team, adopted the billing practice of working less than four hours but having block billing of four hours. And this was a practice that was not unique to the warehouse group. It wasn't what unique about it was they actually wrote down falsely how many hours they worked. As I understood it, there was a precedent for being paid for four hours when you didn't work for four hours. But in that situation, you didn't falsely represent that you only worked two. You represented how many you worked and then you still got the four. Yes. The evidence didn't show whether or not the billing slips under Captain Dowd were accurate or not accurate, but that was the government's strongest argument to prove actual knowledge. The counter to that was that just like court time when officers went to court for 15 minutes, they were able to get overtime billing for four hours. Same with recall. They went home. There was an emergency. They came back. There was an operation crosswalk where there was a pedestrian safety operation that they charged four hours. Don't you have a problem with the fact that he would leave the building where he and his subordinates worked. He would lock it up and thereafter when no one could possibly be working in the building, he put in more than $17,000 worth of overtime requests, I believe for him personally, when the building was closed and they were not working overtime. Yes, and that was part of the government's prosecution. Right. Isn't that a major factor in his knowledge that what he was doing was at least willfully blind or in reckless disregard of the rules? Well, I would argue that's evidence if it was believed and the evidence wasn't disputed of actual knowledge that this case didn't have to go to the jury on some diluted mens rea standard. No one ever questioned this practice under Captain Dowd. No one questioned it under Captain Evidence. A third captain came in and adopted the same four-hour block standard. The counter to your honors, and I do understand that that's evidence that a defense lawyer would have to beat to a jury, is there was no concealment. This was a 30-year experience. Boston police officer to sergeant to captain. They could have turned off the alarm at 8 o'clock. They could have kept the lights on till late. One of the 8 or 10 of them could have stayed around if they thought they were doing something wrong, if they wanted to conceal it. Anybody driving by the warehouse would see it was closed at 6 o'clock or 5.30 or 6.30 or 7. And that's what the trial should have been about, whether Captain Evidence knew when he adopted Captain Dowd's custom and practice that he was committing a crime, that he was walking over the line between being innocent and being criminal. There shouldn't have been this assumption that he had an obligation to question the custom and practice that an equally credentialed captain put into place. When there are new CEOs or new SCFOs in companies, they don't automatically question practices within their entity. Here you had a Boston police officer group, a captain, two sergeants, police officers, and they all accepted this custom and practice before Captain Evidence came in. What he did is, originally he put his accurate hours in and then he saw the custom and practice that preceded him and he changed his billing and he adopted that practice and he didn't question that practice. It seems at some point when the government presents evidence of actual knowledge and when the defense is, I didn't know, I looked at the others and thought it was okay, that sort of implicitly puts into play the argument, well, did you ask before you wrote down? Because it's hard to think of another reason to write down four hours other than you were creating a record that was false. And again, to put a duty on a captain who's coming in and sees that eight other officers, get captains, sergeants, officers, all, and this is a police department, it's not even a company, he had every right to assume that Captain Dowd checked it out, that it was lawful, it was done openly. But isn't it a fair argument that, well, he should have asked? He should have asked, it starts walking into this negligent standard of convicting somebody that they should have asked, they should have known, as opposed to they did know. And that's the prejudice that comes from willful blindness instructions. But that would be true in every willful blindness case. It would, but in many of the cases, this circuit and others, the Kenodia case that my brother looks to, I know the case I represented him, it was, you should have asked your wife, who was general counsel for one of two companies that was in a merger, you should have asked her whether the information she was telling you was secret and confidential, even if she said it to other people. In the drug case, it's, there was a drug defendant in the Azubike case that said, I don't want to hear anything about what's contained in the container. The mortgage case, Appolin, there was two sets of phony loan documents. I guess my point is that in every single case where a willful knowledge instruction is warranted, it, to use your words, waters down the standard some, because it replaces actual knowledge with willfully ignoring and therefore never acquiring the actual knowledge. So then the real decision for the court, because it's often upheld, these instructions, and it's, the court has chosen between de novo and abusive discretion review and often avoided that by saying that the court's instruction is correct, is when in court cases should there not be a willful blindness instruction? This is a paradigm of a case that was fought over actual knowledge. There wasn't a word from the government in its opening and its summations that this was, that there was any contrivance by Captain Evans not to inquire, that there were red flags. This was all tried on a basis that he was a thief, he was a fraud, he was a liar, that he knew what he was doing. And the defense was not mistake of fact or mistake of law. The defense is he understood what the custom and practice was. He adopted it. He believed it to be legal. Now, a jury could have disbelieved it. This was, you know, I would argue there's not harmless error here, and I understand, you know, the objection was twice made. The government claims it wasn't made carefully enough. Can we turn to the issue of the sufficiency of the evidence on the receipt of federal funds? And specifically, I want you, if you could, to confine your answers to count two, which I think has the shortest time period. Yes. What is your best argument that the government didn't establish that the Boston police received over $10,000 during that time period? And in particular, I'm wondering if you see Falconev's as similar to this case or different? You know, number one, the Boston police did receive more than $10,000 in federal funds. They received a large amount of funds under a violence program, a lesser amount under domestic violence, but that's not the test by the circuit under the Bravo-Fernandez III. There were three different Bravo-Fernandez decisions. That required, consistent with the Supreme Court's decision in Fisher, that the government prove, not through just common sense in the Bravo-Fernandez case, the district of Puerto Rico got $4 billion. The court vacated the conviction because the government didn't prove, consistent with the language of 666, that it was a benefit. Fisher set up a test that was adopted by the circuit in Dubon, Otero, and later in Bravo-Fernandez. So is your argument that they didn't prove it was a benefit or that I thought you also made an argument that it was at least plausible that the initial quarterly reimbursements weren't made during that time period? Yes, the threshold argument was that there was no proof that these funds, given to them by the federal government on grants, was consistent with a federal program that had its operation, its purpose, its structure, proven to the jury, which is the test set explicitly by Fisher and Bravo-Fernandez. The second twist in terms of the count two, which had a March 2015 to April 2016 period, is that the two programs that the government focused on, the violence and the domestic violence, rather than general equipment, which would be completely outside of the benefit if there was equipment grants, that there was no proof that within that year more than $10,000 of the overall amounts of money went to the Boston police. It can be, again, common sense. You might assume it because of the amount of money versus the amount of months that were outside of the indictment. But the burdens on the government, they ignored Bravo-Fernandez. They ignored Fisher. You had labels that were substitutes for real evidence that was required by Fisher. The Fisher said to determine whether an organization participating in a federal assistance program receives benefits, and that's what's required by statute, not funds, an examination must be undertaken. One, the program's structure, operation, and purpose. And two, this inquiry should examine the conditions under which the organization, here the Boston Police Department, received the funds. The government simply failed to prove under either count one or count two either of these imperatives that were set by the courts, Supreme Court and Fisher, and then adopted by this court in Dubon-Otero and later in Bravo-Fernandez. Thank you. I may have misunderstood, but I believe in the period from April 2015 to March 2016, the Boston Police Department received $28,000 from a JAG equipment grant. Are you saying that was the only grant made during the relevant time period? No, Judge. That's the only one of the three programs that the witness, the Boston auditor, testified to where the monies only came during the 13 or 12 months that was within the scope of count two. The other two grants were received under much more elastic conditions more months. The problem with the JAG equipment loan, which is the only one that was specific to that time period, is we don't know from the evidence whether that was an equipment grant from JAG equipment company, whether it was a federal grant that led to the purchase of equipment. And the cases, including Fisher, have been clear that equipment purposes are not benefits. Federal funds to buy equipment simply don't fit the element of benefit that the courts have set as a required jurisdictional predicate for condition under federal program. Thank you. Thank you very much. Thank you, counsel. At this time, would counsel for the appellee please introduce himself on the record to begin? Good morning, Judge Montecalvo. May it please the court, Mark Quindlivan on behalf of the United States. Let me start with the willful blindness issue. And I just want to touch briefly on the threshold question of the standard of review because after the final charge was given, but before the jury retired to deliberate the entirety of the objection noted by defense counsel, what were the words? I said, the willful blindness. That is not sufficient under Rule 30D and this court's decisions in O'Connor and Gabrielle which we cited in our brief are square on that point. In O'Connor, both of those cases were also willful blindness issues. In O'Connor, defense counsel said I object to the willful blindness. I incorporate by reference all of my arguments in my prior pleadings. This court said that didn't comply with Rule 30D and in addition said the fact that the basis for the objection may have been laid out in prior pleadings quote, matters not a whit. In Gabrielle, very similarly, defense counsel objected to a willful blindness instruction and said he was incorporating the arguments that he had made in the charge conference. This court again said that was insufficient under Rule 30D and that claim was subject to plain error review. In our view, the correct standard in this case is plain error but ultimately this court can simply bypass that question because under any standard of review the willful blindness instruction was appropriate in this case. Let me go through the steps why that is. There was a long the evidence showed that there was a long standing Boston Police Department policy that no matter what type of overtime shift an officer worked you list the actual hours worked or the actual start and end times for that shift and the actual hours worked and this is so clear that on the overtime slip itself it says actual start and end times actual in all caps and actual hours worked in bold and underlined. This was a policy the evidence also showed that the defendant well understood because both prior to his tenure in the ECU and after his tenure in the ECU when he worked a court or recall time shift he listed the correct start and end times and the correct number of hours worked even though he was going to be receiving a four hour minimum. I think one of the most significant pieces of evidence is that just a week prior to taking command of the ECU unit he was at that time the head of the court unit. He sent an email to the members of his of that group reminding them that they needed to list the actual start and end times for a shift. So there's no circumstance under Boston Police Department policy where even if you're going to receive a four hour minimum you don't list the correct and actual start and end times for a shift and the actual number of hours worked. He then becomes the head of the ECU unit and that's what the officers in that unit were doing. Uniformly they were saying that they were working from 4 to 8 p.m. and that they had worked four hours even though the practice at that time was that they were working split shifts. One group would work from 4 to 6, another group would work from 6 to 8. The defendant in the evidence also showed at least on four occasions as my friend has acknowledged did list the actual start and end times when he worked a shift of less than four hours and he was paid just for the amount of time that he actually worked. So this as we argued in the brief, this was simply a mammoth red flag that something was amiss in the way the practice that was ongoing in the ECU and it's no answer to simply say he simply adopted the policy. He was one of the as my friend has said, he was one of the 20 captains in the Boston Police Department. As a captain you're charged with proactively looking and trying to not just discover but also correct any misconduct by those under your command. And yet there was nothing of that done. Instead the defendant simply began doing the very same thing that the other officers were doing. So he was certifying that their slips were correct and he was submitting his own slips for overtime that were incorrect. And when the practice switched in 2015 from the split shifts to where everyone started working at 4pm but typically only for 2 hours or so and the ECU was closed and alarmed long before 8pm again, the defendant and those under his command were submitting slips saying that they had worked from 4pm to 8pm and that they had worked 4 hours total. Again, a classic case where a willful blindness instruction is appropriate. This case was not the binary choice between actual knowledge. Given the arguments that the defense was raising it was entirely appropriate for the district court to give an instruction of this nature. Could you move to the 666?   I guess I have two questions which you can probably anticipate. Are you arguing that the JAG equipment grant qualifies as a benefit? We are not making that argument. Okay, that's what I thought. Secondly, do you want to address this issue of whether the government established that $10,000 was received as a benefit? I think I understand the defense argument making the two-fold argument that we didn't establish that there were benefits and we didn't establish the money. With respect to whether the $10,000 limit was established there were two grants that we believe support those kinds of convictions. The first is the Boston Community-Based Violence Prevention. That was a grant that ran from October 1, 2015 to December 31, 2017. During that period the Boston Police Department received a little less than $2.9 million. They received that money. The testimony was on a quarterly basis and as we noted in our brief, if you divide the nine quarters at issue out of the money you're well over $300,000 for each quarter. It doesn't sound like benefits. Yes, Judge Kayada. I think our argument is that the testimony was a Boston Community-Based Violence Prevention and the other one was a Violence Against Women Prevention Grant. But for all we know, looking at the record, that went to salary and fringe benefits for the people running those programs. Well, two answers, Judge Kayada. First off, under the statute and I think we cited the 11th Circuit's decision in Chafin for this proposition. The exclusion under the statute is for salary paid by the federal government not amounts that are given to an organization that then use that to pay salary or reimbursements. That's the first answer. The law has been very clear that you have to have testimony as to the structure of the operation and the purpose of the funds being paid. It seems like there's just complete silence in the record. We've got the name and the amount and that's it. Judge Kayada, what we've set forth is the entirety of the record on that issue. I acknowledge that. I think actually, the second one of the Violence Against Women Act is there was more testimony because in addition to the fact that the witness in question, Elise O'Brien, testified that VAWA meant the violence against women, she testified that the funds went to the payment of salaries and other benefits to domestic violence advocates. Now, I want to be clear, though, that with respect to that grant, we're only arguing that the $10,000 amount would fall within count one because that this grant went from October 1, 2015 to December 31, 2016. The entirety of that grant was within the time period charged in count one and under any set of circumstances, therefore, the $10,000 amount, no matter how that's broken up, would be satisfied. So how did that program operate? Judge Kayada, there was not evidence or testimony about that. And how about the structure of the program? There was not, we acknowledge, there was not evidence and as we've argued in our brief, we think that whether this is an issue of law or an issue of fact, a judge or jury exercising common sense could conclude that a program that seeks to prevent violence against women, for example, by definition is one that furthers the public interest. But that's the entirety of the evidence regarding that. Didn't we reject the notion if you just rely on common sense as opposed to evidence? I mean, there was tens and tens and tens of millions of dollars that common sense would tell you as we observed that some of it must have gone to benefits and yet we rejected that. Yes, Judge Kayada, but on a ground that's not an issue here because in Bravo Fernandez, this court noted that during the first trial, there was testimony that the funds in question went to a program run by the Puerto Rican Senate to benefit children. On retrial, the entirety of the evidence was that the Commonwealth of Puerto Rico received I believe it was like $4 million. There was not any testimony as to where that money was directed. And it was on background that this court said, maybe as judges exercising common sense, we could determine that some of this by definition would go to something that would qualify as a benefit in the Commonwealth of Puerto Rico but there was no evidence to that effect. So it seems to me you're limited to arguing the payments for the salaries of domestic violence advocates are benefits. We think that both of the grants in question certainly yes, we think that the Violence Against Women with the testimony of what that grant was used for by the Boston Police Department would satisfy benefits and again because the entirety of that grant October 1, 2015 to December 31, 2016 fell within the time period in count one. No matter how that is broken down during that time period, it would be more than $10,000 within a single year. And then on count two you have the community fund. With count two we're only arguing the community based grant and that's because the time frame again the time frame of count two was March 2015 so several months before the start of the grant which was October 1, 2015 and the time frame ended April 2016 several months before the end of the grant, December 31, 2016. And what is the extent of the record testimony as to whether that community fund is a benefit in terms of the purpose of the funds, etc.? And then I know there's testimony that the grants were paid quarterly but is there testimony that they were actually paid? Well there were spreadsheets that showed that yes, the Boston Police Department there was both spreadsheets that was introduced into evidence and testimony that the Boston Police Department actually received these monies and that they were paid. In response to your question, Judge Montgomery with respect to the Violence Against Women grant, the testimony was that it was used to I think the exact words were to pay the salary, fringe, and overtime of domestic violence advocates. Yes, but as to the community-based? The community-based it was just a paraphrase of basically the title in the grant that it went to a Boston community-based violence prevention program. So if we agreed with you, we would affirm but if we disagreed with you on either one of those two sources of funds, we would reverse the conviction on that count and send it back for resentencing? Well they were all six counts of conviction the defendant received a concurrent sentence for. The only testimony or evidence that differed was the testimony and evidence from the testimony of Lisa O'Brien and the evidence about these grants. I think on some occasions where there's been concurrent sentences, this court has basically said that the sentence will stand but in recent cases there have been occasions where this court has sent it back because potentially the district court had a package of adoption. So I don't think this court's cases point necessarily in one specific direction in a situation like this. Mr. Quinlivan your argument as to the VAWA grant is obviously stronger than your argument as to the other but it also depends on this circuit adopting the 11th Circuit rule about pay and salaries which we've not done to date. Has any other circuit adopted that rule or has there been any criticism of that case? I have not seen criticism of that decision. It has been followed by several district courts. I have not seen a court of appeals. That doesn't help. I understand. I will say though that I don't understand that the defendant has made that specific argument with respect to these counts. All that the opening brief did is drop a footnote and cite to section 666C there's no developed argumentation as to that. But in answer to your question Judge Lynch I have not seen any other circuit that has addressed that specific question or criticized the 11th Circuit's decision in shape. Well it just strikes me that the term benefits of course providing employment to people is always a benefit to society but it could be Congress meant something a little different. Yes and if that specific claim had been developed in the briefs we would have responded in greater detail to it. Well if you count as a benefit not just payments that go to people like Social Security and things like that but you count the wages and fringe benefits of government employees or contractors then you've pretty much called everything benefits except I suppose equipment purchases. That may be correct but I would sort of in the opposite direction it would mean that multiple programs meant to benefit society in any number of ways depend on people implementing those programs. Right but name a federal program that you'd like to go on the record as saying is not meant to benefit society. Yes I understand the point and again Judge Tejada I would just point out this was not a developed argument if this had been raised as one of the grounds then we would have responded in greater detail You mean below? No here on appeal. As we pointed out the only argument in the opening brief was just a footnote and citation to section 6.6c no developed argument as to even if both of the challenges that the defendant was making that these didn't that the government did prove benefits and that the $10,000 requirement wasn't satisfied that it would still fail because as to the VAWA grant these were salaries and salaries under 6.6c don't fall. So are you saying there's some arguments that you haven't yet made on this issue? I well I'm saying that if the court would like for a supplemental brief we'd be happy to provide one on this issue. We were responding to the arguments that the defendant raised in his opening brief and that was not one of them. Here's the problem it's the government's burden of proof and the government was remarkably sloppy here and I hope this isn't an ongoing practice in the U.S. Attorney's  There are Supreme Court cases that just lay it out exactly what you need to do and instead you seem to have thought just putting in the name of the grant and common sense. Well of course money for to combat violence against women benefits society I might personally agree but that is not necessarily what Congress meant by the term benefit and that's what the Supreme Court said I take the point Judge Lynch and I will say this case has been a good lesson to us going forward with respect to I would have thought the Supreme Court decisions were adequate notice Understood Judge Lynch Thank you Thank you Counsel at this time Counsel for the Appellant. Murray introduced himself on the record he has a two minute rebuttal Just briefly on the 666 issue the Supreme Court in Fisher does look at salaries and says they need to be part of proof of an overall federal program that otherwise meets the requirements of 666 turning to willful blindness which is the issue that cuts across all the counts rather than just the counts 1 and 2 the government argues that there wasn't a sufficient objection I get that rule 30 D asks for the grounds of an objection but here the willful blindness instruction was not criticized on appeal for its language there was no focused argument that Judge Stearns didn't properly instruct on willful blindness. It was clearly an all or nothing instruction that was added after the judge circulated his draft instructions the government said during that end of day 4 of the 5 day trial we're going to give you a willful blindness instruction the judge comes back and says well I adopted it but I modified it and the objection is I object to the addition the willful blindness addition Judge Stearns understood even reminded counsel to re-object as he must after the instructions. He understood this was all or nothing. Defense counsel don't want willful blindness instructions they never helped the defense there was an all or nothing objection here and there would be plain error if the objection was to a part of the language of the instruction but I think it was clear to the court this was all or nothing there wasn't a sufficient basis for the willful blindness instruction. The defendant still has to show that this is not harmless error under the McClelland standard that when it goes when an erroneous instruction goes to an essential element the government has the burden beyond a reasonable doubt of showing harmlessness and we argue here that when Captain Evans adopted what all of the other captains, sergeants, police officers were doing for over a year that provided a strong basis that he didn't have actual knowledge and the contract didn't prohibit four hour blocks there was no concealment this was a close case despite the overtime slip that said actual hours and it should have been submitted to the jury on a traditional willfulness standard a knowledge standard rather than allowing the dilution through the willful blindness instruction Thank you. Thank you very much Thank you counsel that concludes argument in this case